## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF TENNESSEE AT CHATTANOOGA

| | |
|---|---|
| **ESTATE OF BRANDON D. GASH,** b/n/k )<br>**HARRY GASH** and **SHERYL GASH**, parents, )<br> )<br>Plaintiffs, )<br> )<br>V. )<br> )<br>**NURSE SHEILA GOINS,** )<br>**SGT. JOSH BROWN,** )<br>**DEP. DHAVAL PATEL,** )<br>**NURSE TASHA BOWERS,** )<br>**OFFICER DAVID BRANSON,** )<br>**LT. CAROL THOMAS,** )<br>**DEP. SCOTT DOVE,** )<br>**LT. ANDERSON SANDERS,** )<br>**OFFICER SAM PAINTER,** )<br>**CITY OF CLEVELAND,** )<br> )<br>Defendants. ) | Case No. **1:19-cv-00229**<br><br>JURY TRIAL DEMANDED |

\*All nine individual defendants are sued in both their individual and official capacity. All were present in the Bradley County jail on April 19, 2018 where Brandon Gash died that day.

### FIRST AMENDED COMPLAINT

COME the Plaintiffs, by and through undersigned counsel, and hereby file their First Amended Complaint, which retains the entire substance of the April 22, 2019 Complaint and amends only by adding the following paragraphs, beginning with paragraph VIII; however, the case number and court have changed to reflect the fact that the Defendants have since removed the case to Federal court.

## I. JURISDICTION AND VENUE

This is a lawsuit filed by the next of kin of Brandon Gash, who died on April 19, 2018, while in the custody of the Bradley County Justice Center in Cleveland, Tennessee. He and his parents were or have been at all relevant times residents of Bradley County, Tennessee.

Bradley County, Tennessee is a municipality subject to the provisions of 42 U.S.C. 1983, et seq. So, too, is Quality Correctional Health Care (QCHC), a corporation headquartered in the State of Alabama, as it undertakes on a for-profit basis the traditional and core functions of the sovereign, to wit, the provision of healthcare to those incarcerated by judicial order. It had and continues to have a major business presence inside the State of Tennessee, much of which is within Bradley County.

For the purposes of this Complaint, Bradley County and QCHC are State actors, whose agents and employees at all times acted under color of State law.

Bradley County employed Defendants Brown, Patel, Branson, Thomas, Dove, Sanders. QCHC employed Defendants Goins and Bowers. The City of Cleveland employed Sam Painter.

The Plaintiffs allegations made herein pursuant to 42 U.S.C. 1983, 1985, 1986, and 1988.

## II. FACTS

At about 1:30 a.m. on Thursday, April 19, 2018, Brandon Gash was arrested by the City of Cleveland Police Department and transported to the Bradley County Justice Center. As he approached the jail's booking area from the Sallyport, Brandon Gash was in acute medical distress. He was unable to communicate with the jail personnel, his diminished capacity clear to any objective observer. So clear, in fact, that as soon as he entered, Officer Patel noted that he

could not walk, was sweating badly, was falling down, and couldn't put his hands on the wall to facilitate a search of his body. His blood pressure reading was 160/100, at a minimum.

Officer David Branson observed the same symptoms. Before 3:00 a.m., Jailer Joshua Brown saw that Mr. Gash could hardly stand and needed a chair to sit. At 2:30 a.m., Office Jacob Stephenson noted that Mr. Gash was dripping with sweat, shaking uncontrollably, and talking to himself.

At about 2:45 a.m., Gash could not respond to questions or commands, nor could he take a shower on his own. Still sweating and shaking, Brandon Gash was found in the shower room in the same position as the jailers had left him, according to the copious notations of Jacob Stephenson. No water was running.

## III.

By about 3:00 a.m. on the morning of April 19, 2018, several of the jailers and nurses on duty had become subjectively aware of the severity of Brandon Gash's medical condition. At that time, it became incumbent upon them to provide medical care commensurate with his serious medical needs. Their failure to do so constituted cruel and inhuman punishment and thereby violated the Eighth and fourteenth Amendments to the United States Constitution.

## IV.

Since 1976, established law has consistently held that deliberate indifference to the serious medical needs of a prisoner constitutes cruel and inhuman treatment. Because such treatment implicates rights under the Eighth and Fourteenth Amendments, Plaintiffs may pursue remedies for the violation under 42 U.S.C. 1983 (<u>Estelle v. Gamble</u>, 429 U.S. 97).

**V.**

All ten (10) defendants had a subjective appreciation of Mr. Gash's medical crisis and knew that it was serious and life-threatening. The objective signs of a pending calamity were there for all to see, warnings that would be readily apparent to a layperson.

By not making the obvious choice to call an ambulance when one could have made a difference, the Defendants evinced a collective and deliberate indifference to the health and life of Brandon Gash, who died as a result of their willful and unconscionable neglect.

The City of Cleveland has a policy, practice and custom of not transporting arrestees to a medical provider, no matter how ill or seriously sick the arrestee may be. This is but a cost-cutting measure, one that is clearly unconstitutional, violating the Fourth, Eighth and Fourteenth Amendments to the United States Constitution. Officer Sam Painter was under official orders to carry out this unconstitutional policy and did so in this instance.

**VI. <u>DAMAGES</u>**

WHEREFORE, PREMISES CONSIDERED, the Plaintiffs sue the institutional Defendants jointly and severally in the sum of $5,000.000.00 as actual damages for their violations of 42 U.S.C. 1983, and for their attorney fees pursuant to the provisions of 42 U.S.C. 1988. The Plaintiffs sue the individual Defendants jointly and severally in the amount of $2,000,000.00 in actual damages as well as for $2,000,000.00 in punitive damages. Plaintiffs further demand a jury to hear the issues brought forth in this Complaint.

**VII.**

The Plaintiffs ask for general relief and all other damages and awards to which the evidence in this case may prove them entitled. The continuing problems and the plethora of

unending tragedy call for judicial oversight, injunctive relief, and a thorough and painstaking investigation by local, State, or Federal authorities.

## VIII.

T.C.A. § 8-20-120 and 8-24-103, taken together, command the Tennessee Sheriffs and County Commissioners to provide priority funding for the county jails. If a Sheriff lacks the public funding for his or her "statutorily mandated duties," T.C.A. § 8-24-103 authorizes a sheriff to seek a writ of mandamus to compel a county legislative body to fund those duties. One such duty, as specifically mandated by T.C.A. § 41-4-115(a) is the provision of medical care to the prisoners.

## IX.

During his campaign in 2014, candidate for sheriff, Eric Watson, recognized that the jail had serious problems and said so across the hustings of Bradley County. Yet, once sworn in, Watson was reluctant to structure and advocate for a budget adequate to meet and solve major problems. Soon, agents from the Tennessee Corrections Institute (TCI) found that his penal facility was overcrowded, understaffed, and unsanitary, and beset by major plumbing and ventilation problems. There was a spate of jail deaths and injuries, one of which involved an inmate who went untreated after vomiting blood.

## X.

Instead of facing these problems squarely, Watson fudged documents to make it appear that the jail had a larger staff than it had in actuality. As Commissioner Dan Rawls pointed out, Watson did this by including in the jail budget those who didn't actually work in the jail. Before too long, the jail was repeatedly failing inspections and sometimes turning away prisoners

because of the overcrowding. Some high-ranking veteran officials, like Gilley, Botts, Smith, and Lawson, left in disgust or frustration, as Watson's intransigence made it impossible for them to carry out their mission. On June 14, 2017, the resigning Gilley noted that the jail was operating "with about one-half the staff it needs."

## XI.

Yet, after multiple failed inspections and the untimely demises or catastrophes that befell inmates Ray, Yerber, Newell, and Dover, Watson and the County Mayor were pleased to announce on March 29, 2016 that the Bradley County Sheriff's Office budget would be cut by $275,000.00.

## XII.

In the Fall of 2013, QCHC and Bradley County entered into a Health Services Agreement (HSA). It excluded QCHC from the both the cost and responsibility for providing health care services to an incoming prisoner who presents "at booking with a life-threatening injury or illness or in immediate need of emergency medical care." Section 1.5 (a).

In the same section, QCHC contracted to limit its treatment to inmates who are "medically stabilized," who don't require "immediate medical care or outside hospitalization," such as the prisoner who "can be reasonably housed" inside the jail.

## XIII.

On August 7, 2017, a new agreement was struck between the same principals, but absent from the new contract was any limitation upon treating incoming prisoners. With this new contract came a huge increase (48.5%) in the annual amount paid to QCHC by Bradly County, from $738,387.27 (2016) to $1,000,095.00 (2017).

## XIV.

Despite this high price tag, medical care for prisoners failed to improve.

Some commissioners complained that QCHC had far surpassed its $75,000.00 limit for offsite care, saddling Bradley County with $42,000.00 for this expense. As a result, QCHC executive Justin Barkley took off to Cleveland on May 22, 2017 to reassure the Commissioners.

After Barkley pledged to economize, QCHC intensified its unconstitutional practice of cutting back the number of inmates it sent to the hospital, with an eye towards minimizing costs to Bradley County. In synchronicity, Bradley County continued to issue OR bonds to inmates injured inside the jail, so as to lower medical costs. One older inmate, beaten by thugs inside the prison, received an OR bond on February 13, 2018, one presented to the Criminal Court by Gabe Thomas, who told the Judge that this inmate had been injured at home. Tasha Bowers refused to transport another inmate, Jason White, even after he broke several bones after jumping off the top tier of B-Pod. Both actions were done in order to save Bradley County money, as it had just forked over 1.1 Million Dollars to QCHC.

Further burdening the understaffed and overcrowded jail was the Bradley County Attorney, who on or about May 26, 2017, issued an opinion that the jail could no longer turn down inmates because of health concerns. Her opinion, which was the basis of a concord reached between the City of Cleveland and Bradley County, dovetailed perfectly with the 2002 Attorney General Opinion 02-015 that held that no inmate could be refused emergency medical care.

During the Watson administration, the average number of inmates went from about four hundred (400) to six hundred (600), an increase of 50% in a facility with a maximum occupancy

of four hundred eight (408). Yet, the number of corrections officers increased by less than 10% over the same period, and the total salaries paid to those officers by even less.

## XV.

According to Section 1.2 (b) of the 2017 contract, QCHC takes responsibility for an inmate's health care once he is booked and placed into the facility, where the inmate then undergoes a preliminary health screening by Bradley County Sheriff's Office staff members trained to do so by the Medical Director. Subsection (g) states that QCHC staff will train the jailers in CPR, though the contract does not say where and how often this training must occur.

## XVI.

Section 1.3 (a) speaks to the responsibility that QCHC has to arrange the emergency care and transport of prisoners, with Section 1.8 charging Bradley County with the costs of transportation (Section 1.8).

## XVII.

Section 1.4 lays upon QCHC both the cost of providing on-site care to prisoners faced with a medical emergency and the responsibility for arranging an emergency transport when medically necessary.

## XVIII.

When Brandon Gash arrived at the jail in the early morning of April 19, 2018, there was a clear and present medical emergency. The jailers noted that Mr. Gash was sweating heavily, was incoherent, and so unstable on his feet he could not stand for a pat-down of his person. The sweating continued for hours, and his blood pressure reached dangerous proportions, thereby

imparting notice to QCHC nurses and Bradley County jailers alike that Mr. Gash was in the midst of a grave medical emergency.

Moreover, both were aware that Mr. Gash had possessed and swallowed large and dangerous dosages of methamphetamine. He was incoherent or non-communicative at all times, a sure indication that a serious medical emergency was afoot.

When offered a shower, Mr. Gash remained near-motionless for twenty (20) minutes, never taking one. When his jailers returned, Mr. Gash had not moved. Faced with a frozen and nearly comatose subject, the jailers had to change him into his prison outfit, as Mr. Gash was too impaired to change clothes.

## XIX.

Having witnessed Mr. Gash's deteriorating plight, QCHC nurse Goins insisted that he drink a couple of cartons of milk, a clearly inadequate effort to subdue Mr. Gash's serious medical condition. She later offered him a Clonidine, which he refused to swallow. Nurse Goins' responses to what she knew to be Mr. Gash's serious medical condition were consciously inadequate, as she was aware, or would soon become aware, that her palliatives could not stem the deterioration of his already serious condition.

## XX.

Instead of transporting a prisoner they knew to be seriously impaired to an emergency department, QCHC nurse Goins, and later Bowers, chose to retain the victim of a serious overdose in the jail, where there were no means to treat what both knew to be Mr. Gash's serious and declining condition. Their inaction was in step with Corporate QCH, whose executive, Justin

Barkley, publicly declared before the Bradley County Commission that QCHC would treat most medical conditions on-site.

**XXI.**

In fact, when Brandon Gash arrived at the prison, no jailer or nurse completed an intake sheet, most likely because he was too impaired to help fill one out. Despite knowing this, the QCHC nurse Defendants never attempted to test Mr. Gash for chemical quantities, to identify and measure the range of toxic chemicals that were clearly ravaging his body. Upon information and belief, the Defendant nurses lacked either the equipment or knowledge to conduct such a test, because QCHC failed to train and supervise them, or in the alternative, failed to provide them with the necessary medical means to conduct such a test. This institutional failure occurred after QCHC had negotiated a hefty increase under its HSA with Bradley County, which upped its annual payment to QCHC after the latter, for the first time, agreed to provide medical services to incoming inmates who presented with medical emergencies.

**XXII.**

At 6:25 a.m., the QCHC nurses noticed that Mr. Gash continued to sweat profusely, just as he had when his incarceration began nearly five (5) hours before. Soon after starting her morning shift, Deputy Christa Murray asked QCHC nurses Goins and Bowers if there were any plans to transport Mr. Gash. There was no response, just quizzical looks. Murray had noted that he was alive and still breathing, implying that there were serious critical questions about his health. In her record, Murray notes that Mr. Gash was lying in his cell, seldom moving.

Nurse Bowers seemed distracted as she began her morning shift, perhaps having just added to her repertoire of Facebook comments about how tedious and laborious was the nature

of her job at the jail. In the past, she had argued strenuously against transporting patients, as she had been instructed to keep costs down. In 2018, a multi-fractured Jason White lay in pain for hours, but she ordered him to remain in the jail. Another time, Bowers told a male inmate to kick another in the testicles to see "if he's really passed out."

Upon beginning her shift on April 19, 2018, Bowers did nothing to counter the notably and objectively serious medical condition of Brandon Gash, which she saw and knew was increasingly dangerous. Instead, Bowers affirmatively failed to order a transport for an inmate that she had no means to treat, whom she knew was suffering from a large overdose and rapidly deteriorating from the overdose. When, by 8:00 a.m., Mr. Gash had fallen into a fatal cardiac arrest, Bowers broke into flight, running through the facility screaming and crying because her patient had died; and, perhaps, ceaselessly wailing because she knew that she had consciously failed to take the simple expedient that would have saved the life of another human being that she knew was in a state of medical destitution.

## XXIII.

Now deceased, Mr. Gash was finally transported to the Tennova emergency department, where efforts at resuscitation continued to be futile. The Defendant nurses, the jailers, and Officers Sanders and Edwards had simply waited too long to call for the simplest of measures: transporting Brandon Gash.

As the Bradley County EMS attendant duly recorded in his records, the nurses and jailers on the incoming morning shift were confused and unaware of the seriousness of Gash's condition. He made theses entries pursuant to a business duty, and from them arise a clear inference that QCHC nurse Goins failed to bring the incoming nurses "up to speed" about his

medical history. Her failure to properly chart and record her patient's serious medical history exhibited her deliberate indifference to the continuity of care necessary for adequate and consistent patient care.

## XXIV.

To spin this ghastly demise, Defendant and Chief Jailer Gabe Thomas gathered his jailers and told them to write their reports, which, after his instruction, sounded remarkably alike. Each jailer noted that he saw Gash's heart beating through his shirt, minutes after Gash had collapsed and quit breathing. Defendant Thomas thereby tried to create the illusion that the jailers had nothing to worry about, as if a visibly beating heart negated the duty to attend to Gash's serious medical needs.

This is the same Gabe Thomas, who on May 19, 2017, testified that he didn't know who the QCHC doctors were, as "Johnny Bates don't come around much anymore"; the same Gabe Thomas who failed to investigate this case, often loses evidence, and out of a personal pique, has often taken away mats from prisoners so that they would have to sleep or sit on concrete.

Gabe Thomas has released ill prisoners, such as Stanley Walker, without a court order, and once obtained an OR bond for a prisoner, namely Billy Joe Rogers, as he lay dying on the concrete of Gabe Thomas' jail. Again, motivated by the desire to avoid the costs of treating inmates injured in his jail, Thomas ordered an OR bond just hours after inmate Justin Presley suffered multiple and serious fractures during his incarceration in what Gabe Thomas calls "my jail."

## XXV.

By deliberately failing to devise a plan to implement emergency health care after being paid to provide it by Bradley County, QCHC evinced a conscious disregard for the serious medical condition of Brandon Gash. In doing so, QCHC vindicated the public statement made by Commissioner Thomas Crye to the effect that animals in shelters are often better cared for than Bradley County inmates, especially those who aren't State or Federal prisoners. This abject lack of coordination between shifts drew a comment from the arriving medics on the morning Mr. Gash died, and is attached to this Amended Complaint.

As a pretrial detainee, Brandon Gash was, under the Fourth and Fourteenth Amendments, entitled to adequate health care for his serious medical needs. By deliberately failing to provide it, the institutional Defendants must answer in damages. While the individual Defendants saw plain evidence of a serious medical emergency (from his hours of profuse sweating and skyrocketing blood pressure to his inability to stand, speak, or dress himself after what they knew was his serious drug episode) and consciously denied him a transport and cure, the institutional Defendants failed to put into place a system whereby there would be a coordinated response to Mr. Gash's emergency.

Both institutional Defendants ignored the HSA provisions: meetings were never held, reports never compiled, published, or filed. Bradley County has never had a line in its budget for training jailers as first-responders, and QCHC rarely, if ever, schooled the jailers in recognizing or preventing sudden deaths in the incarceration setting. QCHC took its richest contract yet, just months before Mr. Gash died, largely because it promised to provide the emergency medical care that, before 2017, it had refused to render. With the new money came a new responsibility, one

that QCHC never effectively carried out, having devised no plan whatsoever to treat effectively those incoming inmates afflicted by serious drug overdoses.

It is ironic that under the old contract of October 2013, QCHC had the right to insist that an inmate in Brandon Gash's condition be stabilized at a hospital before its nurses would tend him in its jail facility. Operating under the lucrative 2017 contract that includes a duty to provide emergency services, QCHC refused to take Gash to the same hospital to which it would have referred him in 2013.

This refusal evinces a serious and deliberate indifference to a critical medical need, because both the institutional Defendants and the individual Defendants all knew that QCHC lacked the means, and its nurses, the knowledge, to save the life of Brandon Gash at the Bradley County jail.

The individual Defendants are liable even if they didn't appreciate subjectively the seriousness of Mr. Gash's condition and the probable results of their conscious disregard of it, as the Sixth Circuit is gravitating towards the objective reasonable person standard in controversies involving detainees, which here focuses on what an objectively reasonable jailer or jail nurse would have apprehended and done under the circumstances. See <u>Kingsley v. Hendrickson, et al.</u>, at 576 U.S. No. 14–6368 (2015), decided by the United States Supreme Court in 2015, as well as the Sixth Circuit case <u>Richmond v. Huq</u> at No. 16-2560 (6th Cir. 2018).

(Signature on following page)

Respectfully submitted,

**LAW OFFICES OF JOHN M. WOLFE, JR.**

*s/ John M. Wolfe, Jr.*

**JOHN M. WOLFE, JR.   |   BPR No. 010319**
*Counsel for Plaintiffs*
707 Georgia Avenue, Suite 302
Chattanooga, TN 37402
423.266.8400 | Phone
423.265.8055 | Fax
johnmwolfejr@comcast.net

## CERTIFICATE OF SERVICE

I certify that I filed this document with the Clerk of the Court, using its electronic filing system, which will send notification of the filing to all registered users of the system involved in this case.

/s/ John M. Wolfe, Jr.
**John M. Wolfe, Jr.**